ZACHARY T. CARLYLE (*pro hac vice forthcoming*)
CarlyleZ@sec.gov
SHARAN E. LIEBERMAN (*pro hac vice forthcoming*)
LiebermanS@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, Suite 1700
Denver, Colorado 80294-1961
Telephone:   (303) 844-1000
Facsimile:   (303) 297-3529

Local Counsel:
DANIEL BLAU (Cal. Bar No. 305008)
blaud@sec.gov
SECURITIES AND EXCHANGE COMMISSION
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone:   (323) 965-3306
Facsimile:   (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> RYAN C. DREXLER <br><br> Defendant. | Case No. 2:23-cv-05102 <br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiff, United States Securities and Exchange Commission (the "SEC"), for its Complaint against Ryan C. Drexler ("Drexler" or "Defendant"), alleges as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b),

20(d), 20(e), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), 77t(e), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

2.     Drexler, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business set forth in this Complaint.

3.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa]. For the majority of the time period relevant to this Complaint, Drexler resided in Beverly Hills, California, and worked in the headquarters of MusclePharm, Corp. ("MusclePharm"), in Burbank, California, and certain of the acts, practices, transactions, and courses of business alleged in the Complaint occurred within this District.

4.     Drexler entered into a tolling agreement to toll the running of any statute of limitations against him from July 8, 2022, through January 4, 2023. Drexler entered into a second tolling agreement to toll the running of any statute of limitations against him from January 5, 2023 through July 4, 2023.

## SUMMARY

5.     Drexler, during his tenure as Chairman, President, and Chief Executive Officer ("CEO") of MusclePharm, a publicly-traded nutritional supplement company, engaged in a scheme to defraud MusclePharm's investors about the strength of the company's controls over financial reporting and disclosures and the devastating impact of MusclePharm's debt default in the third quarter of 2022. His conduct also ran afoul of critical rules regarding the processes, controls, and procedures that public companies, like MusclePharm, must have in place to provide assurance that their accounting and public reports are accurate.

6.    Drexler's fraudulent and deceptive conduct manifested itself in two specific ways. First, Drexler failed to ensure that, and made false statements about whether, MusclePharm had basic processes, controls, and procedures in place to ensure that its accounting for revenue, profit, and other important financial metrics – all of which was reported to and relied on by investors – was correct.

7.    Drexler was responsible for maintaining appropriate internal control over financial reporting ("ICFR") and disclosure controls and procedures ("DCP") at MusclePharm. Under SEC rules, public companies, such as MusclePharm, are required to maintain ICFR and DCP, which include processes designed to provide reasonable assurance that their financial reporting complies with generally accepted accounting principles ("GAAP") and controls designed to ensure that information is disclosed pursuant to SEC requirements. Drexler failed to ensure that MusclePharm maintained appropriate ICFR and DCP and made false and misleading statements about both.

8.    In every annual and quarterly report that Drexler signed and certified on behalf of MusclePharm between at least year-end 2017 and the third quarter of 2018, Drexler certified that he had evaluated MusclePharm's ICFR and DCP. In fact, he had not performed any evaluation.

9.    Drexler's failure to ensure that MusclePharm maintained ICFR and DCP contributed to MusclePharm reporting inaccurate financial statements for at least the year-end 2017 through the third quarter of 2018.

10.    Second, in the third quarter of 2022, Drexler engaged in deceptive conduct and made misleading statements by hiding from investors that a $10 million debt to MusclePharm creditors had been automatically accelerated and was presently due, resulting in immediate and catastrophic consequences for the company and its investors.

11.    In addition to his fraudulent and deceptive conduct, Drexler also violated critical provisions of the securities laws by directing MusclePharm not to report

COMPLAINT                          3

exceptional turnover in a key financial position, and engaging in conduct that led to MusclePharm underreporting certain perquisite compensation that executives at the company received.

12.    Finally, Drexler did not reimburse MusclePharm for cash bonuses that he received after filing financial statements that were later restated due to misconduct, as required by the Sarbanes-Oxley Act of 2002 ("SOX").

13.    By engaging in this conduct, Drexler is liable, and unless enjoined, is likely to continue to: violate or aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; violate Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 13a-14, 13a-15(b), 13a-15(c), 14a-3, and 14a-9 thereunder [17 C.F.R. §§ 240.13a-14, 240.13a-15(b), 240.13a-15(c), 240.14a-3, and 240.14a-9]; and aid and abet violations of Sections 13(a) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 13a-15(a) thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 13a-15(a)]. Drexler also violated and, unless ordered to comply, is likely to continue to violate, Section 304(a) of SOX [15 U.S.C. § 7243(a)].

## **DEFENDANT**

14.    **Ryan C. Drexler**, 52, currently resides in Las Vegas, Nevada. Until approximately April 2021, Drexler resided in Beverly Hills, California. Drexler was the Chairman of MusclePharm's board of directors from approximately June 2015 to December 2022. He also served as MusclePharm's CEO from approximately March 2016 to December 2022 and as MusclePharm's principal accounting officer ("PAO") and principal financial officer ("PFO") from approximately September 2017 to April 2020. Drexler is also MusclePharm's largest lender and shareholder. From 2015 through 2022, Drexler executed multiple notes to loan MusclePharm more than $28 million; certain of those notes were converted to common stock; and he still holds

secured notes totaling approximately $10 million.

## OTHER RELEVANT ENTITY

15.    **MusclePharm Corp.**, is a Nevada corporation that develops, markets, and distributes branded nutritional supplements. Its current principal place of business is in Las Vegas, Nevada, but it was headquartered in Burbank, California from approximately December 2017 until August 2021. MusclePharm's securities are registered pursuant to Section 12(g) of the Exchange Act and traded on the OTC Link, operated by OTC Markets Group Inc., under the symbol "MSLP" or "MSLPQ." In 2015, MusclePharm settled claims brought by the SEC for violations of Sections 5(a), 5(c), 17(a)(2), and 17(a)(3) of the Securities Act; Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 thereunder; and Rule 302 of Regulation S-T of the Exchange Act (the "2015 SEC Order"). MusclePharm filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Nevada on December 15, 2022.

## FACTS

### I.    BACKGROUND AND FINANCIAL RESTATEMENT.

16.    In August 2015, MusclePharm announced a restructuring plan focused on reducing costs and reallocating the company's resources for profitable growth. In its Form 10-K filed on April 2, 2018, MusclePharm announced that this restructuring plan was substantially complete.

17.    During the earnings call for the fourth quarter of 2017, Drexler highlighted the completion of the restructuring program and proclaimed that the company was now on a path to consistent profitable growth.

18.    In order to achieve consistent growth, Drexler pushed MusclePharm's sales team to meet unrealistic quarterly sales targets, and threatened to, and did, fire employees who challenged him or failed to achieve the targets.

19.    In this environment, MusclePharm reported quarter over quarter revenue growth from the fourth quarter of 2017 through the third quarter of 2018. Drexler

highlighted this achievement in each of the Company's press releases and earnings calls during that period.

20.    MusclePharm reported its financial results for these periods in its Form 10-K for 2017 and Forms 10-Q for the first three quarters of 2018, which Drexler signed and certified as MusclePharm's CEO, President, Chairman of the Board of Directors, Principal Executive Officer ("PEO"), PFO, and PAO.

21.    During its 2018 audit work, the company's external auditor detected that MusclePharm had recognized revenue at the end of the fourth quarter of 2018 that it should have recorded in later periods because certain inventory had been temporarily stored off-site in trailers rather than being shipped to MusclePharm's customers prior to year-end.

22.    The company opened an internal investigation to identify the scope and cause of the errors. The internal investigation uncovered similar errors with unshipped orders impacting the third quarter of 2018, and the company filed a Form 8-K on March 14, 2019, announcing that its previously reported financial statements for the three and nine months ended September 30, 2018, should no longer be relied upon. In April 2019, the company announced on Form NT 10-K that it would be unable to timely file its 2018 annual report, and in May 2019, the company's external auditor resigned without completing the 2018 audit work.

23.    More than a year later, on August 25, 2020, MusclePharm filed a Form 10-K that restated its financial statements for year-end 2017 and the first three quarters of 2018 (the "Restatement Period") and included the overdue financial statements for 2018 and 2019.

24.    The restatement disclosed that, during the Restatement Period, MusclePharm inflated its previously reported quarterly revenues by 9 to 25 percent and materially misstated various other aspects of its financial statements.

25.    MusclePharm disclosed in its August 25, 2020 Form 10-Q that its management concluded that MusclePharm had numerous material weaknesses in its

internal control over financial reporting and that its disclosure controls and procedures were not effective.

26.    Drexler signed and certified MusclePharm's August 25, 2020 Form 10-K as MusclePharm's CEO, President, Chairman of the Board of Directors, and PEO.

27.    The Form 10-K filed on August 25, 2020, included a plan to remediate these material weaknesses, but MusclePharm did not correct the material weaknesses.

28.     According to its most recent quarterly report, filed on Form 10-Q on May 16, 2022, MusclePharm again disclosed material weaknesses in the design and operation of virtually all aspects of its internal controls. Specifically, MusclePharm disclosed that:

> "The Company has deficiencies in the design and operation of its internal controls in the financial processes related to the accounting for cash, accounts receivable, accounts payable, inventory, accrued liabilities, income taxes, debt, equity, revenue, costs of sales, stock-based compensation, and expenses classification. In addition, the Company has insufficient controls over the financial close and reporting process, including account reconciliations and preparation and review of financial statements and related disclosures."

29.    On August 17, 2022, MusclePharm announced on Form NT 10-Q that it would not be able to timely file its quarterly report for the second quarter of 2022. Shortly thereafter, on August 22, 2022, MusclePharm announced in a Form 8-K, signed by Drexler, that its financial statements for the year ended December 31, 2021, and quarter ended March 31, 2022, should no longer be relied upon because they reflected errors resulting in material overstatements to reported revenues.

30.    MusclePharm still has not completed the work necessary to restate its 2021 and first quarter 2022 financial statements.

## II.    DREXLER FAILED TO ENSURE THAT MUSCLEPHARM MAINTAINED APPROPRIATE ICFR AND DCP.

31.    Exchange Act Rule 13a-15(a) requires issuers like MusclePharm to

maintain ICFR and DCP.

32.    ICFR is defined in Exchange Act Rule 13a-15(f) in part as "a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, ... to provide reasonable assurance regarding the reliability of financial reporting and preparation of financial statements for external purposes in accordance with generally accepted accounting principles ...."

33.    DCP are defined in Exchange Act Rule 13a-15(e) in part as "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer ... is recorded, processed, summarized, and reported, within the time periods specified in the [SEC's] rules and forms."

34.    ICFR and DCP are the responsibility of a company's PEO and PFO. Throughout the Restatement Period, Drexler was MusclePharm's PEO and PFO. In those roles, Drexler was responsible for ensuring that MusclePharm maintained appropriate ICFR and DCP.

35.    Drexler confirmed this responsibility in each and every quarterly and annual report on Forms 10-Q and 10-K he signed on behalf of MusclePharm during the Restatement Period. The quarterly and annual reports Drexler signed on behalf of MusclePharm during the Restatement Period are comprised of MusclePharm's 2017 Form 10-K filed on April 2, 2018; first quarter 2018 Form 10-Q filed on May 15, 2018; second quarter 2018 Form 10-Q filed on August 14, 2018; and third quarter 2018 Form 10-Q filed on November 14, 2018.

36.    Each one of those filings included a SOX 302 certification, signed by Drexler as MusclePharm's PEO and PFO, which stated that Drexler:

a.    was "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) ...) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) ...) for [MusclePharm]";

b.    "[d]esigned such disclosure controls and procedures, or caused

1    such disclosure controls and procedures to be designed under [his]

2    supervision"; and

3    c.    "[d]esigned such internal control over financial reporting, or

4    caused such internal control over financial reporting to be

5    designed under [his] supervision."

6    37.    Drexler similarly confirmed his responsibilities for ensuring that

7    MusclePharm maintain ICFR in letters to MusclePharm's external auditor that he

8    signed ("Management Representation Letters"). For example:

9    a.    on April 2, 2018, Drexler signed a Management Representation

10    Letter in connection with the audit for the year ended December

11    31, 2017, that asserted that Drexler was "responsible for the fair

12    presentation in the financial statements of financial position,

13    results of operations, and cash flows in conformity with

14    accounting principles generally accepted in the United States" and

15    for "adopting sound accounting policies, establishing and

16    maintaining internal control, and preventing and detecting fraud";

17    b.    on May 15, 2018 and August 14, 2018, Drexler signed

18    Management Representation Letters in connection with the

19    reviews of MusclePharm's financial statements for the quarters

20    ended March 31, 2018 and June 30, 2018 that asserted that

21    Drexler was "responsible for the fair presentation of the financial

22    statements in conformity with accounting principles generally

23    accepted in the United States of America" and "for establishing

24    and maintaining effective internal control over financial

25    reporting"; and

26    c.    on November 13, 2018, Drexler signed a Management

27    Representation Letter in connection with the review of

28    MusclePharm's financial statements as of September 30, 2018 that

COMPLAINT                                    9

asserted that he was "responsible for the fair presentation ... of financial position, results of operations, and cash flows in conformity with accounting principles generally accepted in the United States of America" and "for the design and implementation of programs and controls to prevent and detect fraud."

38. Despite the assertions made in each of the SOX 302 certifications and Management Representation Letters, Drexler failed to ensure that MusclePharm maintained appropriate ICFR and DCP. Indeed, Drexler never read MusclePharm's ICFR and was not aware of whether MusclePharm had any documented DCP at all.

39. Further, when the company's external auditor resigned in May 2019, it noted that during the 2018 fiscal year "the internal controls necessary for the Company to develop reliable financial statements do not exist."

## III. DREXLER MADE MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING HIS EVALUATION OF ICFR AND DCP DURING THE RESTATEMENT PERIOD.

40. Drexler was MusclePharm's PEO and PFO when he signed each of MusclePharm's quarterly reports on Form 10-Q and its annual report on Form 10-K, as well as SOX 302 certifications for each filing, during the Restatement Period.

41. With respect to ICFR, in each and every SOX 302 certification that Drexler signed as MusclePharm's PEO and PFO during the Restatement Period, he affirmed that he "disclosed, *based on [his] most recent evaluation of internal control over financial reporting*" all significant deficiencies, material weaknesses, and fraud. (Emphasis added).

42. With respect to DCP, in each and every annual and quarterly report that Drexler signed as MusclePharm's PEO and PFO during the Restatement Period, he also affirmed that he "evaluated the effectiveness of [MusclePharm's] disclosure controls and procedures (as defined in Rules 13a-15(e) ...), as of the end of the period" and "[b]ased on such evaluation, [he] has concluded that ... [MusclePharm's]

disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information [the company is] required to disclose in reports that [it] file[s] or submit[s] under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the [SEC], and that such information is accumulated and communicated to [MusclePharm's] management, including [Drexler], as appropriate, to allow timely decisions regarding required disclosure."

43.     Additionally, in each and every SOX 302 certification that Drexler signed as MusclePharm's PEO and PFO during the Restatement Period, he affirmed that he "[e]valuated the effectiveness of [MusclePharm's] disclosure controls and procedures."

44.     A reasonable investor would have understood from these statements that Drexler had evaluated MusclePharm's ICFR and DCP for each reporting period during the Restatement Period, that any significant deficiencies or material weaknesses in ICFR based on his evaluation were identified, and that Drexler had concluded that DCP was designed and effective at a reasonable assurance level based on his evaluation.

45.     In reality, Drexler did not perform an evaluation of MusclePharm's ICFR or DCP during the Restatement Period. Moreover, no one under his direction performed an evaluation of MusclePharm's ICFR or DCP. MusclePharm did not have a sub-certification process in place for testing ICFR and Drexler did not see results from any assessment of ICFR. Moreover, Drexler was unaware of whether MusclePharm had any documented DCP.

46.     Each of the above statements regarding Drexler's evaluation of MusclePharm's ICFR and DCP was false when made, and Drexler knew or was reckless in not knowing, and should have known, that his statements regarding his evaluation of MusclePharm's ICFR and DCP were false and misleading. Drexler, when making statements regarding his evaluation of ICFR and DCP, knew that he

1   had not performed an evaluation of MusclePharm's ICFR or DCP during the
2   Restatement Period, and had not seen results of any other assessment of ICFR or
3   DCP.

4          47.    The above misrepresentations regarding Drexler's evaluation of
5   MusclePharm's ICFR and DCP were material because, among other things, investors
6   and potential investors would consider Drexler's statements regarding his evaluation
7   of MusclePharm's ICFR and DCP important when assessing whether MusclePharm's
8   reported financial results were accurate.

9   **IV.    DREXLER OBTAINED MONEY FOR MUSCLEPHARM BY**
10  **MEANS OF THESE FALSE AND MISLEADING STATEMENTS.**

11         48.    Drexler obtained money for MusclePharm by means of the
12  misstatements regarding his evaluation of MusclePharm's ICFR and DCP because,
13  from at least June 2018 to May 2019, through private placements, MusclePharm sold
14  (i) restricted stock to board members to pay for board fees, (ii) common stock to
15  plaintiffs engaged in civil litigation with the company to pay for litigation
16  settlements, and (iii) common stock to vendors to pay for invoices. As the CEO and
17  Chairman of the Board of Directors, Drexler voted to approve these private
18  placement sales and was involved in implementing the sales by, for example, signing
19  letters to the stock transfer services company directing them to issue the shares and
20  send stock certificates to the applicable parties.

21  **V.     DREXLER'S FAILURE TO ENSURE THAT MUSCLEPHARM**
22  **MAINTAINED ICFR LED TO MATERIALLY FALSE FINANCIAL**
23  **STATEMENTS.**

24         49.    In the Form 10-K filed on August 25, 2020, MusclePharm restated its
25  financial statements for the Restatement Period. The restatement disclosed that,
26  during the Restatement Period, MusclePharm inflated its previously reported
27  quarterly revenues by 9 to 25 percent, overstated its gross margins by 22 to 49
28  percent, understated its customer credits by 23 to 38 percent, understated its inventory

by 23 to 34 percent, and overstated its advertising and promotional expenses by 284 to 594 percent.

50.    These errors were caused, in part, by Drexler's failure to implement and maintain ICFR for MusclePharm and the resulting material weaknesses in MusclePharm's internal controls.

51.    MusclePharm disclosed in its August 25, 2020 Form 10-K that its management concluded that eleven "material weaknesses" existed throughout the Restatement Period. The filing states that a material weakness is "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of … annual or interim financial statements will not be prevented or detected on a timely basis." The material weaknesses identified by MusclePharm's management included:

    a.    "Pressure to achieve sales targets gave rise to the premature and/or inappropriate recognition of revenues, typically occurring at or near the end of financial reporting periods";

    b.    "The Company's internal controls failed and/or were not adequate to ensure that there was effective testing of period end sales cutoff, including a proper review and comparison of invoice dates and related proof of delivery";

    c.    "Inadequate segregation of duties, allowing for an improper alignment of sales and operations under common leadership";

    d.    "Management did not maintain an effective control environment, including ensuring that required accounting methodologies, policies, and technical accounting personnel were in place. This control deficiency led to a series of corrections related to the years 2018 and 2017 and resulted in a restatement to the respective previously issued financial statements";

    e.    "The Company did not properly classify payments to customers,

primarily for promotional activity, as a reduction in the transaction price with its customers, instead treating such payments as an advertising and promotions activity, a component of operating expense";

    f.    "The Company reported certain sales transactions prior to transfer of control of goods, inconsistent with customer sales agreements and the Company's customary practices";

    g.    "The Company did not properly estimate the expected value of customer payments, in the form of credits, at each quarter period end in 2018. In addition, the Company understated its accrual for customers credits for the year ended December 31, 2017"; and

    h.    "The Company lacks the proper internal control documentation and testing, and therefore internal controls were not consistently performed."

52.    Drexler signed and certified MusclePharm's August 25, 2020 Form 10-K as MusclePharm's CEO, President, Chairman of the Board of Directors, and PEO.

## VI.    DREXLER MADE MATERIALLY MISLEADING STATEMENTS ABOUT MUSCLEPHARM'S DEBT.

53.    In October 2021 and June 2022, MusclePharm raised over $10 million from a group of institutional investors (the "Noteholders") through the sale of notes and warrants (the "Notes").

54.    In August and September 2022, the Noteholders sent letters to the company reserving their rights under the Notes because MusclePharm engaged in conduct that caused two events of default. Specifically, the Noteholders stated that MusclePharm had: (i) provided materially untrue or incorrect financial statements as evidenced by the company's August 22, 2022 announcement that its 2021 and first quarter 2022 financial statements should no longer be relied upon; and (ii) not replaced the resigning CFO with a new CFO who was not objectionable to the

Noteholders.

55.    Drexler signed a MusclePharm Form 8-K dated September 19, 2022, disclosing the receipt of these letters, but also assuring investors that "the Noteholders have not accelerated payment of the outstanding balances under the Notes and have not informed the Company that the Noteholders intend to accelerate payment of the outstanding balances under the Notes."

56.    A reasonable investor would have understood from this disclosure that MusclePharm's debt under the Notes had not been accelerated.

57.    The Form 8-K omitted the fact that the Notes included a "right o[f] automatic acceleration," which provided that "the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice [of acceleration] of any kind." As such, MusclePharm's debt was automatically accelerated at the time the event of default occurred, which had an immediate impact on the company's liquidity and triggered its obligation to disclose an acceleration of direct financial obligations under Item 2.04 of Form 8-K.

58.    The September 19, 2022 Form 8-K was misleading because it indicated that the company would not suffer any meaningful negative repercussions as a result of the events of default unless and until it received a payment demand from the Noteholders. In fact, the event of default had an immediate negative impact on MusclePharm's liquidity.

59.    Drexler's misleading statement about the acceleration of the company's debt was material to reasonable investors because the status of the debt was central to the company's ability to continue normal business operations and maintain control over its assets.

60.    On September 22, 2022, just three days after MusclePharm filed the Form 8-K, the Noteholders sent a payment demand letter to Drexler stating that the outstanding balances under the Notes were "immediately due and payable" and that "the Notes have been accruing, and will continue to accrue, Default Interest."

61.    Thereafter, the Noteholders exercised their rights under the Notes to secure payment of the debt by sweeping the company's bank accounts in approximately October 2022, causing MusclePharm to cease all normal business operations, and placing the company's assets up for auction in approximately November 2022, forcing MusclePharm to seek bankruptcy protection to halt the asset sale.

62.    Drexler knew or was reckless in not knowing, and should have known, that his statement regarding the acceleration of the company's debt was misleading. The September 19, 2022 Form 8-K included direct quotes from the acceleration provision of the Notes but omitted language from the very same paragraph describing the right of automatic acceleration. This selective citation to the acceleration provision shows that Drexler knew or was reckless in not knowing, and should have known, that the Notes automatically accelerated without notice. Drexler also knew or was reckless in not knowing, and should have known, that acceleration of the Notes would cause immediate and devastating consequences for the company. And, in fact, these consequences came to light just three days later when the Noteholders sent a payment demand, which ultimately resulted in the Noteholders sweeping the company's bank accounts and placing its assets up for auction in an effort to secure payment of the Notes.

## VII.    DREXLER ENGAGED IN FRAUDULENT OR DECEITFUL CONDUCT.

63.    As detailed above, Drexler engaged in deceptive conduct regarding the evaluation of MusclePharm's ICFR and DCP, as well as the status of the company's debt. Among other things, Drexler:

      a.    did not evaluate the effectiveness of the company's ICFR and DCP, despite the requirements to do so in Exchange Act Rules 13a-15(b) and (c);

      b.    signed SOX 302 certifications during the Restatement Period

attesting to the fact that he evaluated MusclePharm's ICFR and DCP when he had not performed any evaluation of the company's ICFR or DCP;

c.    signed each annual and quarterly report during the Restatement Period attesting to the fact that he evaluated MusclePharm's DCP and concluded that they were effective when he had not performed any evaluation of the DCP; and

d.    withheld information from investors about the Notes' right of automatic acceleration and the immediate and catastrophic impact it would have on the company and its investors.

64.    Drexler knew or was reckless in not knowing, and should have known, of his deceptive conduct. Drexler knew or was reckless in not knowing, and should have known, that he had not performed an evaluation of MusclePharm's ICFR or DCP. And Drexler knew or was reckless in not knowing, and should have known, that the Notes automatically accelerated without notice and that acceleration of the Notes would cause immediate and devastating consequences for the company.

## VIII.  DREXLER AIDED AND ABETTED MUSCLEPHARM'S FRAUD.

65.    MusclePharm, through Drexler, engaged in deceptive conduct and made material false and misleading statements by failing to properly evaluate its ICFR and DCP during the Restatement Period and making material misstatements about those evaluations in its Form 10-K and Forms 10-Q. MusclePharm also engaged in deceptive conduct and made material misleading statements by withholding information from investors regarding the acceleration of the company's debt and making misleading statements about the status of the company's debt in its September 19, 2022 Form 8-K.

66.    MusclePharm, through Drexler, knew or was reckless in not knowing, and should have known, that its conduct was deceptive and that its statements were false and misleading.

67.     For the reasons detailed above, Drexler knowingly or recklessly substantially assisted MusclePharm's deceptive conduct and misstatements. Among other things, Drexler (i) acting as MusclePharm's PEO and PFO, did not evaluate the effectiveness of the company's ICFR and DCP, (ii) signed SEC filings on behalf of MusclePharm that contained material misstatements regarding his evaluations of MusclePharm's ICFR and DCP, (iii) withheld information from MusclePharm investors regarding the acceleration of MusclePharm's debt, and (iv) signed the September 19, 2022 Form 8-K on behalf of MusclePharm that contained material misleading statements regarding the status of MusclePharm's debt.

## IX.    DREXLER'S FAILURE TO ENSURE THAT MUSCLEPHARM MAINTAINED DCP LED TO UNDERREPORTED PERQUISITES AND VIOLATIONS OF THE PROXY SOLICITATION PROVISIONS OF THE FEDERAL SECURITIES LAWS.

68.     Accurate disclosure of executive perquisites was the primary focus of the 2015 SEC Order. Pursuant to the 2015 SEC Order, MusclePharm engaged an independent compliance consultant ("ICC") to, among other things, strengthen the disclosure controls and procedures relevant to accurate disclosure of perquisite compensation.

69.     In February 2017, the company certified to the SEC that it had complied with the undertakings in the 2015 SEC Order, in part, by implementing a disclosure control recommended by the ICC to use an "[a]nnual questionnaire[] … provided to the members of the Board of Directors and executives to identify any perquisites." ("D&O questionnaire").

70.     MusclePharm used a D&O questionnaire in early 2017 to identify 2016 perquisites. But, the very next year, after Drexler took over the PFO and PAO roles in the third quarter of 2017, neither he nor anyone else at the company used a D&O questionnaire, or any other controls, to identify 2017 perquisites for its named executive officers: Drexler and the Executive Vice President of Sales.

71.    MusclePharm's Travel and Expense Policy outlined the procedures for obtaining reimbursement for business expenses, including specifically identifying the business purpose of the expense and submitting original receipts.

72.    During 2017, Drexler disregarded these procedures by seeking reimbursement for expenses that were not supported by any business purpose or appropriate documentation.

73.    Drexler obtained reimbursement for significant commuting expenses and other expenses not integrally and directly related to his job that should have been classified as perquisites.

74.    Based on this conduct, Drexler received undisclosed perquisites in 2017 comprised of approximately $129,200 in personal legal fees, $66,200 of tax gross-ups on restricted stock, $22,800 in commuting and living expenses, $8,300 in furniture expenses, and $4,500 of other personal expenses.

75.    As a result of the conduct described above, MusclePharm materially underreported executive perquisites in its 2017 Form 10-K, which was signed by Drexler, by approximately $231,000 (88 percent) for Drexler and approximately $107,900 (54 percent) for the Executive Vice President of Sales.

76.    MusclePharm filed a definitive proxy statement on October 26, 2018, that it used to solicit proxies in connection with, among other things, the re-election of Drexler to the board of directors and an advisory vote on the executive compensation packages for Drexler and other executive officers.

77.    Drexler, as a director of the company, participated in the solicitation.

78.    Section 14(a) of the Exchange Act makes it unlawful to solicit any proxy with respect to any security (other than an exempted security) registered pursuant to Section 12 of the Exchange Act in contravention of such rules and regulations as the SEC may prescribe. Rule 14a-3 provides that no solicitation of a proxy may occur unless each person solicited is concurrently furnished or has previously been furnished with a proxy statement containing the information specified by Schedule

14A, including executive compensation. Rule 14a-9 prohibits the use of proxy statements containing statements that are materially false or misleading by omission.

79.    The proxy statement reported the same executive perquisites as those reported in MusclePharm's 2017 Form 10-K executive compensation disclosures. As a result of Drexler's conduct in connection with the disclosures described above, MusclePharm materially underreported executive perquisites in the October 26, 2018 proxy statement by approximately $231,000 (88 percent) for Drexler and approximately $107,900 (54 percent) for the Executive Vice President of Sales.

80.    Accurate and transparent executive compensation disclosures are material because the amounts that executives are paid, as well as the amounts executives are paid as perquisites, are important to an investor's assessment of a company's likely future profitability and the alignment of management's interests with the interests of shareholders.

81.    Drexler should have known that the perquisite disclosures in the proxy statement were materially misstated because, among other reasons, he had knowledge of the unreported perquisites he received and he failed to exercise reasonable care with respect to DCP involving executive compensation.

## X.    DREXLER DIRECTED MUSCLEPHARM NOT TO FILE REQUIRED CURRENT REPORTS ON FORM 8-K REGARDING MUSCLEPHARM'S PAO.

82.    MusclePharm experienced exceptional, undisclosed turnover in the PAO position in the third quarter of 2017. In fact, in just a single quarter, three different people held the position of PAO at MusclePharm. In July 2017, the interim CFO/PAO resigned and was replaced by a new CFO/PAO in August 2017, but he resigned the following month. Whereupon Drexler was appointed as the interim PAO in September 2017.

83.    Issuers are required to disclose all changes to the PAO position on Item 5.02 of Form 8-K within four business days of the event.

84. None of the third quarter 2017 changes were timely disclosed.

85. In August and September 2017, Drexler received and reviewed draft Forms 8-K related to one PAO's resignation, but he instructed the company's controller not to file the disclosure.

86. Instead, MusclePharm waited until November 14, 2017, to file a Form 8-K, which Drexler signed, that belatedly disclosed all the changes that occurred in the PAO position in the prior quarter.

## XI. DREXLER FAILED TO REIMBURSE MUSCLEPHARM FOR BONUSES RECEIVED IN THE 12 MONTHS FOLLOWING MISSTATED REPORTS.

87. SOX Section 304(a) requires the CEO and CFO of any issuer required to prepare an accounting restatement due to material non-compliance with financial reporting requirements under the securities laws as a result of misconduct to reimburse the issuer for (i) any bonus or other incentive or equity based compensation received by that person from the issuer during the twelve-month period following the first public issuance or filing with the SEC of the misstated document, and (ii) any profits realized from the sale of securities of the issuer during that twelve-month period.

88. MusclePharm was required to restate its financial statements contained in its Form 10-K for the year ended December 31, 2017, and its Forms 10-Q for the quarters ended March 31, 2018, June 30, 2018, and September 30, 2018, because, as a result of misconduct, its financial statements did not comport with GAAP.

89. MusclePharm's restatements for those periods were disclosed in its Form 10-K filed with the SEC on August 25, 2020.

90. Drexler received bonuses in the 12-month period following the first public issuance or filing with the SEC of the misstated Form 10-K for the year ended December 31, 2017, and one or more of the misstated Forms 10-Q, including a $100,000 cash bonus paid on May 31, 2018, and a $250,000 cash bonus paid on

August 15, 2018.

91.     Drexler has not reimbursed any bonus amount to MusclePharm.

## XII.   DREXLER VIOLATED, OR AIDED AND ABETTED MUSCLEPHARM'S VIOLATIONS OF, REPORTING, CERTIFICATION, REPORTING CONTROLS, AND INTERNAL CONTROLS PROVISIONS OF THE FEDERAL SECURITIES LAWS.

### A.      Drexler Aided and Abetted MusclePharm's Violation of Reporting Provisions of the Federal Securities Laws.

92.     Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13 thereunder require issuers like MusclePharm to file reports with the SEC containing such information as the SEC's rules prescribe. Further, Exchange Act Rule 12b-20 requires that an issuer's statement or report contain such further material information as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

93.     As detailed above, MusclePharm violated these reporting provisions by (i) filing annual and quarterly reports with the SEC that misstated Drexler's evaluation of the company's ICFR and DCP, (ii) filing a current report on September 19, 2022, that contained misleading statements about the Notes acceleration as described above, and (iii) failing to file required current reports regarding PAO turnover.

94.     Also as detailed above, Drexler aided and abetted these violations by knowingly or recklessly providing substantial assistance to MusclePharm's violations. Among other things, Drexler (i) signed and certified each of the annual and quarterly reports that included false and misleading information about his own conduct, (ii) signed the misleading September 19, 2022 current report on Form 8-K, and (iii) directed the company not to timely file a current report regarding the departure of one of the PAOs in third quarter 2017.

**B.** **Drexler Violated the Certification Provision of the Federal Securities Laws.**

95. Rule 13a-14 of the Exchange Act requires, in pertinent part, that each annual and quarterly report include certifications signed by the issuer's PEO and PFO which include representations that (i) based on the certifier's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report and (ii) the certifier designed and evaluated the effectiveness of the registrant's ICFR and DCP.

96. Drexler violated Rule 13a-14 by certifying MusclePharm's annual and quarterly reports during the Restatement Period because (i) he signed the certification without a sufficient basis to believe the certifications were accurate and (ii) he knew that the reports included material misstatements or omissions regarding his design and evaluation of ICFR and DCP.

**C.** **Drexler Violated and Aided and Abetted MusclePharm's Violations of the Reporting Controls Provision of the Federal Securities Laws.**

97. Rule 13a-15(a) of the Exchange Act requires issuers like MusclePharm to maintain DCP and ICFR.

98. MusclePharm violated Rule 13a-15(a) by failing to maintain DCP or ICFR as required. Specifically, MusclePharm failed to implement DCP concerning the identification and reporting of executive perquisites, and failed to maintain appropriate ICFR to prevent and detect accounting errors during the Restatement Period.

99. Drexler knowingly or recklessly substantially assisted MusclePharm's violation of Rule 13a-15(a). For example, although the company certified to the SEC staff in February 2017 that it implemented a D&O questionnaire disclosure control, Drexler failed to use D&O questionnaires, or any other controls, to identify 2017

perquisites that he and the Executive Vice President of sales received. Additionally, as set forth above, Drexler failed to ensure that MusclePharm maintained appropriate ICFR and DCP.

100.   Drexler additionally violated Rules 13a-15(b) and 13a-15(c) of the Exchange Act by failing to evaluate the company's ICFR and DCP, as required by those provisions.

**D.    Drexler Aided and Abetted MusclePharm's Violation of the Internal Controls Provision of the Federal Securities Laws.**

101.   Section 13(b)(2)(B) of the Exchange Act requires issuers like MusclePharm to devise and maintain a system of sufficient internal accounting controls.

102.   In violation of Section 13(b)(2)(B), MusclePharm failed to maintain a system of internal accounting controls sufficient to provide reasonable assurance that revenue, customer credits, gross profit margin, advertising and promotional expenses, and inventory complied with GAAP.

103.   In his role as PEO, PFO, and PAO, Drexler was responsible for devising and maintaining MusclePharm's system of internal accounting controls and, by failing to do so, Drexler knowingly or recklessly substantially assisted MusclePharm's violation of Section 13(b)(2)(B) of the Exchange Act.

**FIRST CLAIM FOR RELIEF**

**Fraud: Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

104.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

105.   Drexler, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security (i) employed devices, schemes, or artifices to defraud, (ii) made untrue statements of material fact or omitted to state a material fact necessary in light of the circumstances

under which they were made, not misleading, and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

106.   By virtue of the foregoing, Drexler, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.C. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF

**Fraud: Aiding and Abetting MusclePharm's Violations of**

**Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Alternatively)**

107.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

108.   MusclePharm, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security (i) employed devices, schemes, or artifices to defraud, (ii) made untrue statements of material fact or omitted to state a material fact necessary in light of the circumstances under which they were made, not misleading, and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

109.   As a result of the conduct alleged herein, Drexler aided and abetted MusclePharm's violations of Section 10(b) of the Exchange Act and Rule 10b-5 by knowingly or recklessly providing substantial assistance to MusclePharm.

110.   By reason of the foregoing, Drexler, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.C. § 240.10b-5] thereunder.

## THIRD CLAIM FOR RELIEF

### Fraud: Section 17(a) of the Securities Act

111.    The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

112.    Drexler, directly or indirectly, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind (i) employed devices, schemes, or artifices to defraud, (ii) obtained money or property by means of untrue statements of material fact or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and (iii) engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon the purchaser.

113.    By virtue of the foregoing, Drexler, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM FOR RELIEF

### Fraud: Aiding and Abetting MusclePharm's Violations of
### Section 17(a) of the Securities Act
### (Alternatively)

114.    The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

115.    MusclePharm, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind (i) employed devices, schemes, or artifices to defraud, (ii) obtained money or property by means of untrue statements of material fact or omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not

misleading, and (iii) engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon the purchaser.

116.   As a result of the conduct alleged herein, Drexler aided and abetted MusclePharm's violations of Section 17(a) of the Securities Act by knowingly or recklessly providing substantial assistance to MusclePharm.

117.   By reason of the foregoing, Drexler, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FIFTH CLAIM FOR RELIEF

**False SEC Filings: Aiding and Abetting MusclePharm's Violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder**

118.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

119.   MusclePharm, which is an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially false and misleading annual, quarterly, and current reports with the SEC that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

120.   As a result of the conduct alleged herein, Drexler aided and abetted MusclePharm's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder by knowingly or recklessly providing substantial assistance to MusclePharm.

121.   By reason of the foregoing, Drexler, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1,

13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## SIXTH CLAIM FOR RELIEF

### False Certifications: Exchange Act Rule 13a-14

122.    The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

123.    As a result of the conduct alleged herein, Drexler falsely certified that MusclePharm's quarterly and annual reports (i) did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading and (ii) that he designed and evaluated the effectiveness of the registrant's ICFR and DCP.

124.    By virtue of the foregoing, Drexler, directly or indirectly, violated and, unless restrained and enjoined, will again violate Exchange Act Rule 13a-14 [17 C.F.C. § 240.13a-14].

## SEVENTH CLAIM FOR RELIEF

### Reporting Controls: Aiding and Abetting MusclePharm's Violations of Exchange Act Rule 13a-15(a)

125.    The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

126.    MusclePharm, which is an issuer of securities pursuant to Section 12 of the Exchange Act and which files annual reports with the SEC pursuant to Section 13(a) of the Exchange Act, failed to maintain required disclosure controls and procedures and internal control over financial reporting in violation of Rule 13a-15(a) of the Exchange Act.

127.    As a result of the conduct alleged herein, Drexler aided and abetted MusclePharm's violations of Rule 13a-15(a) of the Exchange Act by knowingly or recklessly providing substantial assistance to MusclePharm.

128.   By reason of the foregoing, Drexler, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Exchange Act Rule 13a-15(a) [17 C.F.R. § 240.13a-15(a)].

## EIGHTH CLAIM FOR RELIEF

### Reporting Controls: Exchange Act Rules 13a-15(b) and 13a-15(c)

129.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

130.   As a result of the conduct alleged herein, Drexler, violated Rules 13a-15(b) and 13a-15(c) of the Exchange Act by failing to evaluate the effectiveness of MusclePharm's ICFR and DCP.

131.   By reason of the foregoing, Drexler, directly or indirectly, violated and, unless restrained and enjoined, will again violate Rules 13a-15(b) and 13a-15(c) of the Exchange Act [17 C.F.R. §§ 240.13a-15(b) and 240.13a-15(c)].

## NINTH CLAIM FOR RELIEF

### Internal Accounting Controls: Aiding and Abetting MusclePharm's Violation of Section 13(b)(2)(B) of the Exchange Act

132.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

133.   MusclePharm failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and any other criteria applicable to such statements in violation of Section 13(b)(2)(B) of the Exchange Act.

134.   As a result of the conduct alleged herein, Drexler aided and abetted MusclePharm's violation of Section 13(b)(2)(B) of the Exchange Act by knowingly or recklessly providing substantial assistance to MusclePharm.

135.   By reason of the foregoing, Drexler, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of

Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## TENTH CLAIM FOR RELIEF

### Proxy Disclosures: Violation of Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9 Thereunder

136.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as through fully set forth herein.

137.   As a result of the conduct alleged herein, Drexler, directly or indirectly, by use of mails, or the means of instrumentalities or interstate commerce or any facility of a national securities exchange, solicited proxies without furnishing each person solicited a proxy statement containing the information specified by the proxy rules, and used proxy statements containing statements which, at the time and in light of the circumstances under which they are made, were false or misleading with respect to a material fact, or omitted to state material facts necessary to make the statement therein not misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

138.   By reason of the foregoing, Drexler violated and, unless restrained and enjoined, will again violate Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

## ELEVENTH CLAIM FOR RELIEF

### Clawback: SOX Section 304(a)

139.   The SEC realleges and incorporates by reference paragraphs 1 through 103 as through fully set forth herein.

140.    By virtue of the foregoing, MusclePharm filed reports that were in material non-compliance with its financial reporting requirements under the federal securities laws from April 2, 2018, when MusclePharm's Form 10-K for year-end 2017 was filed until November 14, 2018, when MusclePharm's Form 10-Q for the third quarter of 2018 was filed. MusclePharm's material non-compliance with its

financial reporting requirements resulting from misconduct that required the company to prepare accounting restatements for its financial statements for 2017 and the first three quarters of 2018.

141. Drexler received or obtained, during the statutory time periods established by SOX, bonuses, incentives, and/or equity-based compensation which he failed to reimburse to MusclePharm.

142. The SEC has not exempted Drexler, pursuant to Section 304(b) of SOX, from its application under Section 304(a).

143. By reason of the foregoing, Drexler violated and, unless ordered to comply will continue to violate, Section 304(a) of SOX [15 U.S.C. § 7243(a)].

## RELIEF SOUGHT

**WHEREFORE**, the SEC respectfully requests that this Court:

## I.

Find that Drexler committed the violations alleged in this Complaint;

## II.

Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, permanently restraining and enjoining Drexler from violating, directly or indirectly, the laws and rules he is alleged to have violated in this Complaint;

## III.

Order Drexler to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

Order Drexler to reimburse MusclePharm as required by SOX Section 304(a) [15 U.S.C. § 7243(a)].

## V.

Order, pursuant to the Court's equitable powers, Section 20(e) of the Securities

Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], that Drexler is prohibited, following the date of entry of the order, from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted, June 27, 2023.

*/s/ Daniel Blau*
Daniel Blau
Zachary T. Carlyle
Sharan E. Lieberman
Attorneys for Plaintiff
Securities and Exchange Commission